*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0486p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TIMOTHY BRAINARD, et al.,

> *Plaintiffs-Appellants,*

*v.*

AMERICAN SKANDIA LIFE ASSURANCE CORPORATION,
> *Defendant-Appellee.*

No. 04-4510

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-01698—Patricia A. Gaughan, District Judge.

Argued: October 28, 2005

Decided and Filed: December 28, 2005

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Christopher M. DeVito, MORGANSTERN, MacADAMS & DeVITO, Cleveland, Ohio, for Appellants. Joseph Serino, Jr., KIRKLAND & ELLIS, New York, New York, for Appellee. **ON BRIEF:** Christopher M. DeVito, MORGANSTERN, MacADAMS & DeVITO, Cleveland, Ohio, for Appellants. Joseph Serino, Jr., Matthew Solum, KIRKLAND & ELLIS, New York, New York, Arthur M. Kaufman, Erica L. Calderas, HAHN, LOESER & PARKS, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Plaintiffs-appellants Timothy Brainard, George Chanter, Robert Domachowski, and James Dovak (collectively "plaintiffs") appeal from a summary judgment entered in the district court in favor of defendant-appellee American Skandia Life Assurance Corporation ("ASLAC"). Plaintiffs' complaint, filed against ASLAC and Kevin and/or Neil O'Donnell and O'Donnell & Company (a/k/a O'Donnell Securities Corp.) (hereinafter referred to collectively as "the O'Donnells"), alleges wrongdoing in connection with the purchase of certain annuity contracts from ASLAC. Plaintiffs' first contend that the court erred by finding that no agency relationship existed between the O'Donnells and ASLAC. Second, plaintiffs assert that the court wrongly termed the opinion of their chosen expert "conclusory" and thereafter disregarded the expert's declaration. Third, plaintiffs argue that the court improperly granted a portion of ASLAC's motion to dismiss and, fourth, inappropriately disallowed plaintiffs from amending their complaint to add a "necessary" party. Finally, plaintiffs complain that the

district court erroneously failed to strike a declaration submitted by ASLAC's attorney in support of its motion for summary judgment. We disagree and affirm the judgment.

I.

Plaintiffs are unsophisticated investors who sought out financial advice from the O'Donnells in connection with the investment of retirement funds totaling $1,971,314.10.[1] In doing so, plaintiffs indicated to the O'Donnells that they wished to pursue conservative investments. The O'Donnells recommended that plaintiffs purchase variable annuities offered by ASLAC and, in response, plaintiffs completed an application for an American Skandia Advisor Plan II ("ASAP II") variable annuity. By signing that application, each plaintiff acknowledged (1) receipt of a copy of the Prospectus, and (2) that "ANNUITY PAYMENTS . . . ARE VARIABLE AND NOT GUARANTEED AS TO A DOLLAR AMOUNT . . . [.]"

The Prospectus referenced in the ASAP II application revealed the particular features of the annuity and, in particular, contained sections discussing applicable fees and charges. A particular portion of the Prospectus allowed plaintiffs to "authorize a financial representative to decide on the allocation of [their] Account Value and to make financial transactions between investment options, subject to [ASLAC] rules." Significantly, the Prospectus goes on to state as follows:

> We or an affiliate of ours may provide administrative support to financial representatives who make transfers on your behalf. These financial representatives may be firms or persons who are appointed by us as authorized sellers of the Annuity. However, we do not offer you advice about how to allocate your Account Value under any circumstance. *Any financial firm or representative you engage to provide advice and/or make transfers for you is not acting on our behalf. We are not responsible for any recommendations such financial representatives make, any market timing or asset allocations programs they choose to follow or any specific transfers they make on your behalf.*

On the day of signing their ASAP II applications, plaintiffs, acting pursuant to the Prospectus, appointed the O'Donnells as their "Registered Investment Adviser" by signing a document entitled "Investment Advisory Contract." In pertinent part, that document reflected that the O'Donnells would serve as plaintiffs "attorney-in-fact and as agent with authority to act in the name of [plaintiffs] and/or on behalf of the [plaintiffs] with respect to the election, implementations, purchase, sale and timing of the Contract Owner's mutual fund accounts or sub-accounts."

In the days following plaintiffs' execution of the Investment Advisory Contract ("IAC"), plaintiffs received the annuities themselves, including a variable annuity contract. On the first page of that document, it conspicuously cautioned that "[I]N THE ACCUMULATION PERIOD ANY PAYMENTS AND VALUES PROVIDED UNDER THE VARIABLE INVESTMENT OPTIONS ARE *BASED ON THEIR INVESTMENT PERFORMANCE AND ARE, THEREFORE, NOT GUARANTEED*." That front page likewise provided plaintiffs with a twenty-one day window, during which Plaintiffs could return the annuity and receive a refund.

---

[1] The firm of "O'Donnell & Company" was a retail broker/dealer, and Kevin and Neil O'Donnell were "registered representatives" for that company. Plaintiffs included the O'Donnells in their original complaint, but could not also name them in their amended complaint because the O'Donnells had filed for bankruptcy. Apparently, this case represents the O'Donnells' modus operandi. Indeed, in a case almost identical to this one, the district court for the Northern District of Ohio noted that the O'Donnells (1) received fees or commissions by investing funds, (2) did not have formal business training and Kevin O'Donnell did not hold a college degree, (3) the ASLAC investment instruments offered to plaintiffs were subject to a deferred sales charge if surrendered within seven years of purchase, and (4) "an ASLAC investment instrument suitable for market timing with no deferred sales charge was available, but it paid no up-front commission to the O'Donnell group." *McNamara v. American Skandia Life Assurance Corp.*, No. 2599, slip op. at 2 (N.D. Ohio Apr. 29, 2004). According to plaintiffs, the O'Donnells sold more ASLAC securities than any other broker in the nation.

Shortly after finalizing execution of the Investment Advisory Contract, plaintiffs entered into an Investment Allocation Services Agreement ("IASA") with the O'Donnells. In pertinent part, that document noted that ASLAC "will accept on behalf of [plaintiffs], instructions from [the O'Donnells] to reallocate Cash Value among the investment options provided under the Annuity based upon the Advisor's investment expertise in order to take advantage of changes in the market[.]" Significantly, the IASA expressly warned that ASLAC "has no responsibility or liability with respect to the transactions contemplated by this Agreement."

Despite plaintiffs requests to the contrary, the O'Donnells apparently made a series of high-risk investments which were unsuitable for plaintiffs given their ages and investment objectives. Those decisions led to precipitous market losses starting in 2000. Plaintiffs thereafter filed suit against ASLAC, Kevin P. O'Donnell individually, and O'Donnell & Company in Cuyahoga County Court of Common Pleas on June 30, 2003. Defendant ASLAC filed a Notice of Removal to the Northern District of Ohio on August 11, 2003. Plaintiffs' complaint originally alleged fifteen claims, which ASLAC moved to dismiss on September 19, 2003. By order dated April 8, 2004, the court dismissed all but four of plaintiffs' claims. Plaintiffs then asked the court to reconsider its ruling or, alternatively, to allow plaintiffs to amend their complaint to cure certain pleading deficiencies.

Although the court denied plaintiffs' motion to reconsider, it granted in part plaintiffs' motion to amend, thereby allowing plaintiffs to amend six of their claims. Rather than simply amending those claims, plaintiffs re-pled all fifteen counts and added Prudential Financial, Inc. as a new party defendant. After reviewing the amended complaint, the court issued an order striking, sua sponte, Prudential as a party defendant, noting that (1) the deadline to add new parties had long since passed, and (2) plaintiffs failed even to seek leave to add Prudential as a party defendant.[2]

ASLAC then filed its motion for summary judgment on July 30, 2004, which plaintiffs opposed. Plaintiffs also filed a "Motion to Strike Declaration of Matthew Solum in support of Motion for Summary Judgment and Attached Exhibits from the Record" on September 7, 2004 (hereinafter "Solum Declaration"). By order dated November 5, 2004, the court granted summary judgment in favor of ASLAC. In doing so, the court agreed with ASLAC that plaintiffs had failed to come forward with any evidence whatever reflecting an agency relationship between the O'Donnells and ASLAC. As for plaintiffs' motion to strike the Solomon Declaration, the court stated in a footnote at the conclusion of its opinion as follows:

> The grounds for plaintiffs' Motion is that Mr. Solum is simply an attorney for the defendant and has no personal knowledge regarding any of the facts alleged in his Declaration or any of the Exhibits attached thereto. Further, plaintiffs argue that Mr. Solum's Declaration improperly sets forth legal arguments and attempts to authenticate exhibits. The Court rules as follows. The Court (1) grants plaintiffs' Motion to the extent Mr. Solum's Declaration contains any legal argument or unsupported factual assertions; (2) grants plaintiffs' Motion with regard to any Exhibits which are not independently authenticated by deposition testimony; and (3) denies plaintiffs' Motion with regard to any exhibits which are independently authenticated by deposition testimony.

This timely appeal followed.

## II.

We review the district court's entry of summary judgment de novo. *McWane, Inc. v. Fid. & Deposit Co. of Md.*, 372 F.3d 798, 802 (6th Cir. 2004). A district court's interpretation of state law is likewise

---

[2]Plaintiffs subsequently filed a motion to allow an additional party defendant on July 9, 2004, which was denied on August 10, 2004, by non-document minute order. That order denied plaintiffs' motion "for the reasons stated in the brief in opposition. Plaintiffs' request is both untimely and prejudicial."

governed by the de novo standard. *Ferro v. Garrison Ind., Inc.*, 142 F.3d 926, 931 (6th Cir. 1998). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that, in deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party).

We review a district court's decision to disallow the addition of a new party to a complaint for an abuse of discretion. *Benzon v. Morgan Stanley Distribs*., 420 F.3d 598, 605 (6th Cir. 2005); *see Cox v. Treadway,* 75 F.3d 230, 240 (6th Cir. 1996) (noting addition of a party constitutes an amendment to the complaint).

III.

Plaintiffs first assert that the district court erred as a matter of law in holding that no agency relationship existed between ASLAC and the O'Donnells for the purpose of investment decisions. For support, plaintiffs highlight deposition testimony given by ASLAC's experts who both indicated that an agency relationship existed between ASLAC and the O'Donnells. Plaintiffs likewise direct this Court to Kevin O'Donnell's insurance license with the state of Ohio, which ASLAC signed and, in doing so, agreed to "accept the responsibility for the management and supervision of the applicant while engaged in the business of insurance."

An agency relationship may arise pursuant to several theories. First, actual agency occurs where a consensual relationship exists between the agent and principal. *Funk v. Hancock*, 498 N.E.2d 490, 493-94 (Ohio. Ct. App. 1985). Agency relationships may also arise from apparent agency or agency by estoppel. *Agosto v. Leisure World Travel*, 304 N.E.2d 910, 913 (Ohio Ct. App. 1973). The principal's ratification of the unauthorized acts of another may also establish an agency relationship. *Eske Prop., Inc. v. Sucher, Montgomery App.*, 2003-Ohio-6520, at ¶ 97.[3] Given that the existence of an agency relationship is a question of fact, rather than one of law, *McSweeney v. Jackson*, 691 N.E.2d 303, 307 (Ohio Ct. App. 1996), the court should have denied ASLAC's motion if any conflicting evidence of an agency relationship between plaintiffs and ASLAC was presented. In this case, plaintiffs argue that the instant facts potentially raise all three types of agency discussed above.

    1.    *Actual Authority*.

Ohio law reflects that actual agency occurs where there is a consensual relationship between the agent and principal. *Flick v. Westfield Nat'l Ins. Co.*, No. 91-CO-45, 2002 Ohio App. LEXIS 5250, at *27 (Ohio Ct. App. Sept. 26, 2002). "Such actual agency may be informally created and the assent of the parties thereto may be either express or implied." *Wisor v. Zimmerman*, No. 1304, 1987 Ohio App. LEXIS 6042, at *7 (Ohio Ct. App. March 3, 1987) (citation omitted); *see Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254, 257 (Ohio 1992) (noting "an agent, acting within the scope of his actual authority, expressly or impliedly conferred, can bind the principal"). Simply stated, "express authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms[.]" *Davis*, 590 N.E.2d at 257. In contrast, an agent's implied authority may "arise from the express delegation of actual authority and unless its extent is otherwise expressly limited, implied authority carries with it the power to do all that which is reasonably necessary to carry into effect the power actually conferred." *Id.* (citing *Spengler v. Sonnenberg*, 102 N.E. 737, 739 (Ohio 1913)).

---

[3]Ohio has adopted a public domain citation format for cases decided after April 30, 2002.

In this case, no actual agency relationship, be it express or implied, was created between the O'Donnells and ASLAC. Although, as noted, plaintiffs suggest that the deposition testimony given by ASLAC's experts indicates the presence of an agency relationship between ASLAC and the O'Donnells, the district court rejected this argument. In doing so, the court properly noted that although the experts recognized that an actual agency relationship existed between ASLAC and the O'Donnells, that relationship was limited solely to the selling of ASLAC insurance products. As the district court observed, "agency for the purpose of selling defendant's products is far different from agency for the purpose of providing investment advice[.]" *Accord Aluminum Line Prods. Co. v. Rolls-Royce Motors*, 649 N.E.2d 887, 894 (Ohio Ct. App. 1994) ("'[A]gency for the one purpose does not necessarily imply agency for the other.'") (quoting *Funk*, 586 N.E.2d at 1117).

Plaintiffs further argue that an Insurance Product Sales Agreement ("IPSA") creates an issue of material fact with regard to whether an agency relationship existed between ASLAC and the O'Donnells for the purpose of giving/soliciting investment advice. That document, however, reflects an agreement whereby ASLAC "authorize[d] Broker-Dealer [the O'Donnells] to solicit sales of Contracts identified in the attached schedule[s]." Pursuant to the IPSA, that authorization was limited solely "to the extent expressly granted in this Agreement. No further authority is granted or implied." Thus, as the district court found, "[a] grant of authority to solicit sales and payments cannot be equated to a grant of authority to provide investment advice on behalf of American Skandia . . . ."

Contrary to plaintiffs' contentions, no implicit agency relationship existed between ASLAC and the O'Donnells. Plaintiffs rely chiefly on their own deposition testimony, which generally reflects their belief that ASLAC would "watch over" their retirement monies. Pursuant to Ohio law, however, plaintiffs' subjective beliefs are irrelevant to the inquiry governing the existence of actual authority. *See Chevrolet v. Calhoun*, 2004 Ohio 1006, at ¶ 11 (Ohio Ct. App. 2004) ("[A]n implied agency exists by reason of actual authority given implicitly by the principal to the agent and does not depend upon what a third party may believe to be the agency relationship.") (citing *Rubbo v. Hughes Provision Co.*, 36 N.E.2d 144 (Ohio Ct. App. 1940)). Thus, the district court properly held that plaintiffs' subjective beliefs regarding the relationship between the O'Donnells and ASLAC "is simply not relevant to the issue of actual authority." Accordingly, no agency relationship was created by a grant of actual authority from ASLAC to the O'Donnells for the purpose of giving investment advice.

2.    *Apparent Authority.*

For similar reasons, no apparent authority agency relationship existed between ASLAC and the O'Donnells. For an agent to bind the principal in the context of apparent authority, the presented evidence must reflect "(1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817, 822 (Ohio 1991). In this regard, "[t]he apparent power of an agent is to be determined by the act *of the principal and not by the acts of the agent . . .* [.]" *Id.*; *accord Logsdon v. Main-Nottingham Inv. Co.*, 141 N.E.2d 216, 223 (Ohio Ct. App. 1956).

Plaintiffs again offer their deposition testimony in support of their apparent authority claim. Again, however, a court's focus during an inquiry into the existence of apparent authority must be on the acts of the principal and whether those actions manifested a conveyance of authority to the agent. *See Cupac, Inc. v. Mid-West Ins. Agency, Inc.*, 626 F. Supp. 559, 561 (S.D. Ohio 1985) (noting the "touchstone of apparent authority is the principal's conduct toward a third party and not the agent's") (citing *Logsdon*, 141 N.E.2d

at 223).  Plaintiffs' reliance on their own testimony sheds no light on this inquiry and, accordingly, their arguments must fail.[4]

For the totality of the foregoing reasons, no agency theory supports the conclusion that ASLAC should somehow be held liable for the consequences of the O'Donnells investment advice.  Significantly, each plaintiff testified that his financial damages arose from the O'Donnells' investment decisions.  Moreover, as discussed above, ASLAC expressly distanced itself from any investment decisions via a number of binding documents, such as the Prospectus, the IAC, and the IASA.  As the district court properly found, the record is devoid of evidence reflecting the existence of such a relationship.  Accordingly, summary judgment was appropriate.

IV.

Plaintiffs next assign error to the district court's decision to reject the opinions of their expert, John J. Duval, Sr.  Specifically, they argue that Duval based his expert opinion that ASLAC had full knowledge of the O'Donnells' actions in part on the following: (1) Kevin O'Donnell once gave ASLAC ideas for subaccounts; (2) an ASLAC employee attended one of the O'Donnells' financial planning seminars; (3) the O'Donnells supplied marketing materials that including information about ASLAC annuities; (4) certain employees at ASLAC knew about the O'Donnells' seminars; and (5) the O'Donnells were the nation's largest distributor of ASLAC annuities.  Thus, plaintiffs conclude, the district court erroneously disregarded the Duval affidavit as "conclusory."

As a baseline premise, "[i]n rulings on the admissibility of expert opinion evidence[,] the trial court has broad discretion and its rulings must be sustained unless manifestly erroneous."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (citation omitted).  An expert opinion submitted in the context of a summary judgment motion "'must be more than a conclusory assertion about ultimate legal issues.'"  *Id.* (quoting *Hayes v. Douglas Dynamics*, 8 F.3d 88, 92 (1st Cir. 1993)); *see* FED. R. CIV. P. 56(e).  Moreover, an expert opinion must "set forth facts" and, in doing so, outline a line of reasoning arising from a logical foundation.  *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579-80 (11th Cir. 1985).  Thus, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (citing *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 829-32 (D.C.Cir. 1988)).

The district court did not err by disregarding Duval's opinion on the ultimate issue of whether the O'Donnells were ASLAC's agents for investment advice purposes.  First, the Duval report and affidavit (collectively "the Duval materials") were substantially different.  Duval's affidavit opined that a document from the Ohio Commission of Insurance Commissioners appointing the O'Donnells as broker-dealers reflects ASLAC's assumption of responsibility for the management and supervision of the O'Donnells.  In contrast, his expert report neither mentions, nor relies on that document.  As a result, the district court properly possessed the discretion to exclude those materials from consideration.  Indeed, FED. R. CIV. P. 26(a)(2)(B) states, in part, that, "[t]he [expert] report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . [,]" while Rule 26(e)(1) requires that the expert's disclosure be supplemented if there are any additions or changes to the information previously disclosed.  Plaintiffs did not supplement the Duval report.  Thus, given the court's broad discretion to supervise discovery, the court properly excluded the Duval affivdavit.  *Crawford-El v. Britton*, 523 U.S. 574, 598

---

[4] Plaintiffs' separate agency by estoppel argument must likewise fail.  The totality of plaintiffs' argument on this point essentially consists of the assertion that "it would simply be unjust to allow American Skandia to deny the truths of its manifestations through the O'Donnells."  Like a claim of apparent authority, courts considering agency by estoppel focus on the words or conduct of the principal.  *Info. Leasing Corp. v. Chambers*, 2003 Ohio 2670, ¶ 83 (Ohio Ct. App. 2003) ("[A] finding of agency by apparent authority or agency by estoppel must be based upon words or conduct by the principal.").  Plaintiffs' argument fails to direct this Court to any evidence reflecting an intent on the part of ASLAC to make the O'Donnells its agent for the purpose of giving investment advice.

(1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.").

As a secondary matter, the court was correct in concluding that the Duval affidavit is, itself, conclusory. The Duval affidavit employs broad and dramatic language without substance or analysis. At one point, for example, the Duval affidavit summarily concludes that "the O'Donnells were express agents working on behalf and under the supervision of ASLAC and ASM and with full knowledge of American Skandia, Inc. and its subsidiary entities, ASLAC, and ASM." It further elaborates by stating that "ASLAC was aware that most of the O'Donnell clientele were retirees and ignored the fact that the O'Donnells were investing their clients in the highest category of commission investments." Finally, the affidavit posits that "ASLAC condoned the O'Donnell's[sic] actions." Given the absence of meaningful analysis or reasoning, the district court acted well within its discretion by discarding the Duval affidavit. *See Viterbo*, 826 F.2d at 422; *Mid-State Fertilizer Co.*, 877 F.2d at 1339.

V.

Plaintiffs next criticize the district court's April 8, 2004, order, which in part granted ASLAC's motion to dismiss. Citing our decision in *Greenburg v. The Life Insurance Company of Virginia*, 177 F.3d 507 (6th Cir. 1999), plaintiffs specifically contend that the court improperly applied the "economic loss" doctrine to dismiss certain of their negligence causes of action. Plaintiffs also assert that the court improperly dismissed their breach of contract claim because ASLAC breached the implied covenant of good faith and fair dealing. Moreover, plaintiffs argue, the court inappropriately dismissed their claim for negligent infliction of emotional distress.

Contrary to plaintiffs' arguments, the district court acted within its discretion in dismissing plaintiffs' negligence claims. Plaintiffs readily admit that they lost monies as a result of the O'Donnells' poor investment decisions. Based on that admission, the district court properly quoted *Floor Craft Floor Covering, Inc. v. Parma Community General Hospital Ass'n*, 560 N.E.2d 206, 208 (Ohio 1990), for the proposition that "for claims sounding in negligence, the well established rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable," *id.* at 208. As ASLAC notes, plaintiffs' arguments do not address this general rule and, thus, fail to dispute the firmly established premise that "tort liability may not be imposed for purely economic damages." *Id.* ("In the absence of privity of contract between two disputing parties the general rule is 'there is no . . . duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things.'") (quoting Prosser & Keeton, Law of Torts 657 (5th Ed. 1984)).[5]

Moreover, the court acted well within its discretion in dismissing plaintiffs' claim for negligent infliction of emotional distress.[6] Although plaintiffs contend that a decision by the Ohio Supreme Court permits recovery of emotional damages suffered as a result of a contractual breach, the district court rejected that identical argument. Citing *Kishmarton v. William Bailey Construction, Inc.*, 754 N.E.2d 785 (Ohio 2001), plaintiffs argue that Ohio courts allow for the recovery of emotional damages absent a showing of physical injury or threat of physical harm. As the district court observed, however, *Kishmarton* did not involve a claim for negligent infliction of emotional distress.

---

[5]Our decision in *Greenburg v. The Life Insurance Company of Virginia*, 177 F.3d 507 (6th Cir. 1999), is not to the contrary. That decision, as ASLAC notes, does not examine the economic loss doctrine.

[6]Plaintiffs failed below to argue ASLAC breached the implied covenant of good faith and fair dealing. Accordingly, we decline to address it on appeal. *See Brickner v. Voinovich*, 977 F.2d 235, 238 (6th Cir. 1992) (observing that certain appellate arguments were waived because of litigant's failure to adequately raise or preserve them in district court).

The Ohio Supreme Court's decision in *Kishmarton* is indeed limited; the court's holding is expressly limited to allowing emotional distress damages in contract cases involving transactions between vendees and builder-vendors. 754 N.E.2d at 788 ("We are confident that allowing emotional distress damages in breach-of-contract actions involving vendees and builder-vendors will not open the floodgates."). Given that *Kishmarton* does not support plaintiffs' assertions, the district court properly noted that plaintiffs' cause of action for negligent infliction of emotional distress must fail because they did not "allege that they have either witnessed or experienced a dangerous accident or appreciated actual physical peril." *Accord Walkosky v. Valley Mem'ls*, 765 N.E.2d 429, 432 (Ohio Ct. App. 2001) ("[T]his court has noted that an essential element is that the distress is caused by the plaintiff's fear of an actual physical peril.") (citations omitted). Accordingly, the district court properly granted a portion of ASLAC's motion to dismiss without permitting plaintiffs to re-plead certain of their causes of action.

VI.

Plaintiffs next contend that the district court improperly denied their motion to add Prudential as a "necessary party." Without relying on supporting legal authority, plaintiffs assert that ASLAC's apparent affiliation to or with Prudential Financial Company exposes Prudential to civil liability. ASLAC asserts that the court below properly denied plaintiffs' attempts to add Prudential as a party, noting in particular that (1) the deadline to add new parties had long since expired before plaintiffs sought to add Prudential, and (2) the addition of Prudential to the proceedings would have been highly prejudicial.

Federal Rule of Civil Procedure 15(a) governs amendments to pleadings. Although a party may amend a pleading once as a matter of right if it is done before a responsive pleading is served, a party may otherwise amend the party's pleading only by leave of the court or by written consent of the adverse party. FED. R. CIV. P. 15(a). Although leave shall be freely given when justice so requires, *id.*, the ultimate decision of whether to permit amendments rests within the court's discretion, *see Duchon v. Cajon Co.*, 791 F.2d 43, 48 (6th Cir. 1986).

In this case, the district court did not abuse its discretion by denying plaintiffs request to add Prudential as a party to these proceedings. First, plaintiffs did not seek leave to amend to add a new party, FED. R. CIV. P. 15(a).[7] Second, despite the fact that the deadline for adding new parties had passed, plaintiffs failed to demonstrate "good cause" when seeking to add Prudential at such a late date. FED. R. CIV. P. 16 (noting "district judge . . . shall, after receiving the report from the parties under Rule 26(f) . . . enter a scheduling order that limits the time (1) to join other parties and to amend the pleadings. . . ."); *see Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003) (noting existence of "significant prejudice" to a defendant if plaintiff were allowed to amend a complaint when discovery would have to be reopened and a new defense would be necessary to defeat the new claim) (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).[8] Finally, plaintiffs failed to allege how Prudential was allegedly liable to plaintiffs. *Longo v. Glime*, No. 73842, 1987 U.S. Dist. LEXIS 15548, *2 (S.D. Mich. Dec. 17, 1987) ("If no factual allegations are made as to how additional parties are liable, allowing an amended complaint adding those parties may be an abuse of discretion.") (citing *Nat'l Indep. Theatre Exhib. v. Charter Fin. Group*, 747 F.2d 1396, 1404 (11th Cir. 1984)). Thus, the district court neither erred nor abused its discretion by preventing plaintiffs from amending their complaint to add Prudential as a party defendant.

---

[7] The deadline for joining additional parties in this case reflected a date of January 9, 2004. Plaintiffs filed their amended pleading on June 22, 2004, naming Prudential as a party defendant.

[8] Moreover, there is no tenable reason for plaintiffs' attempted addition of Prudential as a defendant. Although plaintiffs highlight a public announcement dated December 20, 2002, which they claim was the first notice that Prudential was acquiring ASLAC, the manner of plaintiffs' reliance on that announcement is entirely unclear. Indeed the announcement date suggests, as ASLAC notes, that Prudential could have been named in plaintiffs' *original* complaint filed on June 30, 2003.

VII.

Plaintiffs finally assert that the district court erred by failing to strike the affidavit of Matthew Solum, ASLAC's attorney. Plaintiffs specifically argue that because Solum was not a party to the case, his affidavit could not be a medium through which exhibits could be introduced. ASLAC contends that Solum's affidavit was created as a matter of convenience for the district court. In particular, it argues that the affidavit merely collected various forms of previously authenticated evidence for the court's benefit. Moreover, to the extent that such a document was inappropriate, ASLAC highlights FED. R. CIV. P. 56(b), which notes that a party moving for summary judgment need not present supporting affidavits in support of its motion. Thus, ASLAC tacitly concludes, other than assembling properly authenticated materials, the Solum affidavit carries no independent significance.

Plaintiffs are correct that the district court should have ruled on their motion to strike the Solum affidavit before granting summary judgment to ASLAC. Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions. *E.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986). Indeed, such an approach makes sense given that a court cannot determine the scope of materials properly before it without first ruling on any pending evidentiary or other discovery motions.

In this case, the district court's footnote ruling fails to precisely identify the excluded portions of the Solum affidavit. The court granted plaintiffs' motion "to the extent Mr. Solum's Declaration contains any legal argument or unsupported factual assertions" and further granted their motion "with regard to any Exhibits which are not independently authenticated by deposition testimony." Yet, confusingly, the court also denied plaintiffs' motion "with regard to any exhibits which are independently authenticated by deposition testimony." Such a ruling hardly clarifies the scope of materials properly considered by the court before ruling on a summary judgment motion.

All affidavits, regardless of the author, must be made on personal knowledge and set forth facts that would be admissible in evidence. FED. R. CIV. P. 56(e); *accord Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) (noting attorney affidavit was improper because it was not based on a personal knowledge of the events giving rise to the underlying litigation). Thus, to the extent that the Solum affidavit was not based on personal knowledge, the district court improperly considered it.

Any error by the district court in considering the Solum affidavit was, however, harmless. Even assuming the contents of the Solum affidavit improperly state facts not based on personal knowledge, plaintiffs were not prejudiced by the court's ruling. *See* FED. R. CIV. P. 61 (stating "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). Indeed, regardless of the contents of the Solum declaration itself, a review of the attachments to that declaration reflects that it only contained properly authenticated discovery materials.[9] Thus, as ASLAC argues, the materials underlying the Solum affidavit were properly considered by the district court. FED. R. CIV. P. 56(e).

Although the better course would have been for the district court to *specifically* delineate the excluded portions of the Solum affidavit, any error was harmless given that the materials attached to the affidavit were properly authenticated and could therefore be considered by the court pursuant to Rule 56(e).

Affirmed.

---

[9] ASLAC included an "Authentication Chart for Declaration of Matthew Solum." That chart organizes the totality of exhibits attached to the Solum declaration and explains how each are properly authenticated for summary judgment purposes.